# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Thomas Thompson, | : | Case No. 5:09CV1236 |
| Plaintiff | : | Judge Christopher Boyko |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) seeking judicial review of defendant's final determination denying plaintiff's claims for disability benefits, (DIB), 42 U.S.C. §§416, 423 and supplemental security income benefits (SSI), 42 U.S.C. §1381 et seq., is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in his favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

The applications underlying this action were filed on November 29, 2005, and alleged an onset date of disability of May 1, 2001.[1]

Upon denial of plaintiff's claims on the state agency level hearing de novo before an Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on September 17, 2008. Also testifying at that proceeding was

---

[1] The plaintiff had previously applied for benefits in 2004, but did not pursue the denial of those applications beyond the state agency level. While this Court found a Disability Report-Adult form which contains a statement as to the alleged disabling impairment(s) filed in conjunction with one of the 2004 applications this Court did not find such a form in this record, certified as full and accurate, relating to the 2005 application.

a vocational expert, Mr. Gene Burkhammer.

At that hearing the plaintiff testified that he last worked around "2000 I think," and that he "had to take a medical lay-off because I blacked out on the job I was doing running a crane and they couldn't take me if I dropped there—If I blacked out and that load shifted and fell and hit somebody, it could kill them." However, when asked by the ALJ what was the most significant problem that kept him from working he answered:

> A. I hear voices, and they tell me to hurt people and kill people. Delusional, depressed and I'm on medicine for all of that.
>
> Q. Okay.
>
> A. So I have a seizure disorder and take medicine for that too.
>
> Q. Okay.
>
> A. And I notice when I'm around a lot of people I get real nervous, like shy away, shut up and shy away from people, even when I'm around my family I do the same thing.[2]
>
> * * *
>
> Q. Have you been hearing more voices over time since—
>
> A. Yeah.
>
> Q. —1996 or the same?
>
> A. Yeah, about—or more because they get real strong and I'll have my brother will grab a hold of me and hold me and I go into a frenzy and start screaming and yelling and, and that's an every day thing.
>
> Q. Now you were hearing voices when you were working as a crane operator?

---

[2]Although the plaintiff also testified to physical impairments, this appeal focuses on his mental/emotional status.

2

A. Yes.

Q. And—

A. Yeah, I thought it was just all in my head, just something that was going on, you know, I didn't, I didn't think it was this serious.

Q. Did it interfere with your ability to do your work?

A. Yes.

Q. In what way?

A. I couldn't, I had to—they—I kept taking breaks and wasn't allowed to and because, I, my, I hear my voices or I get depressed and that and I just go sit in the corner and try to calm down and relax and sometimes it didn't work.  They sent me home, told me not to come back until, until I was healthy again.

Q. How many times did that happen?

A. Oh, about six or seven, then finally I took a medical leave.

Q. All right.  How often have you been hearing voices?

A. All the time.

Q. And what do you mean by all the time?

A. Every day, all the time, I hear them constantly.

Q. What do they say?

A. Tell me to hurt people and kill people.  I've been in, I've been at PEZ (Phonetic), that's the Portage to Path here in Akron, or there in Akron.  I've been to PEZ a couple times and since I moved to Ravenna I've been in Kevin Coleman, that's where I go for my medicine.  I've been in Lebanon Bed (Phonetic) a couple of times there too.

Q. All right.  Well, who have these voice told you to hurt?

A. Everybody, I don't care who I'm around.  I was at, sitting at

> Portage to Path waiting to see my doctor one time and this lady and kid come in and they sat down beside me. I thought everything was okay and all of a sudden I turned around and I looked at her and I said a few choice words to her and my voices told me to hurt her and I got up and walked away. The lady behind the counter, she come out and asked me what was going on and I said I heard voices, they told me to hurt her. So she took me straight back to the doctor and they took me down to PEZ and I stayed there for a week.
>
> Q. What specifically do these voices, or what specifically have those voices told you to do?
>
> A. Hurt people, kill people, telling me how to do it.
>
> Q. In what way?
>
> A. I, I just stab this person or I hit this person in the throat, or I mean they tell me lots of things.
>
> Q. All right.
>
> A. And sometimes it gets real scary, I just, I just want to curl up and die and I'm afraid that one of these times I might act on that and I don't want to do that.
>
> \* \* \*
>
> Q. You said you're depressed, would you describe your depression for me?
>
> A. It's I cry constantly. I've had to take extra Zoloft for my depression and I'm only supposed to take two a day and the last few weeks I've been taking four a day because I just sit there and cry for no reason and don't know why.
>
> Q. Do you know why you're depressed?
>
> A. No.
>
> Q. How does it effect you?
>
> A. I just, when I start getting depressed I can't do nothing, just sit down and cry, that's all I can do.

> Q. And have you told your doctor this?
>
> A. Yes.
>
> A. All right. Does the Zoloft help?
>
> A. Yeah, but I take extra sometimes.
>
> Q. And what, you've told, what you described before is that when you are taking Zoloft or is that how you are if you don't take it?
>
> A. Well, if I don't take Zoloft I'm, I cry constantly, every day constantly. From the time I wake up until the time I go to bed.
>
> Q. Well, what about if your are taking your Zoloft?
>
> A. It varies, it comes and goes but most of the time I'm still crying.

Amazingly, neither the ALJ nor the plaintiff's counsel asked the vocational expert what effect constantly hearing voices telling him to kill people would have on the ability of an individual to hold a job. The closest either came was the following from the ALJ's examination:

> Q. Okay. Because we've got some allegations of hearing voices and being distracted and having difficulty concentrating, so my next question is how often could somebody perform these occupations or how often could somebody be off task and still perform these occupations?
>
> A. No, no more than 15 percent of their workday, which is approximately an hour out of eight hours.
>
> Q. And how often could somebody be absent from work entirely, you know, for a day and still perform these occupations?
>
> A. Usually, the time limit is about three days a month.

On September 30, 2008 the ALJ entered his opinion denying plaintiff's claims. That decision became defendant's final determination upon denial of review by the Appeals Council on April 18, 2009. The ALJ's "Findings of Fact and Conclusions of Law" were:

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2005.

2. The claimant has not engaged in substantial gainful activity since May 1, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: left knee contusions, left hip trochanteric bursitis; seizure disorder; blindness in the left eye; right trapezius strain; a spleen injury; major depressive disorder with psychotic features; anxiety disorder, not otherwise specified; alcohol and cannabis abuse; and history of a learning disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift and carry 10 pounds frequently and 20 pounds occasionally.  He can sit, stand, and walk for six hours in an eight-hour workday except he cannot climb ladders, ropes, or scaffolds; balance; kneel; crouch; crawl; work around dangerous unprotected heights, hazards or moving machinery; perform tasks requiring depth perception; perform tasks requiring interaction with the general public; or perform tasks requiring narrative writing.  He can perform simple, routine tasks requiring only minimal supervision and superficial contact with co-workers and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 10, 1964 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566,. 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The "Issues Presented For Review" as set out in plaintiff's brief are:

1. Did the ALJ have substantial evidence to find that plaintiff did not meet or equal a Listed impairment?

2. Did the ALJ have substantial evidence to discount the treating source opinion of disability?

3. Did the ALJ articulate a valid basis for finding the plaintiff on [sic] partially credible.

This case is very troublesome to this Court, from the standpoint of what transpired at the evidentiary hearing, the ALJ's decision and the parties briefing on this appeal.

To begin with, the authorities relied upon by defendant in support of the contention that plaintiff's argument that he should have been found disabled under Listing 12.02 of the Listings of Impairments has been waived are completely off the mark. The commentary by the Sixth Circuit in McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997) quoted in plaintiff's brief was in the context of a motion for summary judgment in which a contention was adverted to in that motion in a cursory manner, with no supporting argument. Young v. Secretary of Health and Human Services, 925 F.2d 146, 149 (6th Cir. 1990), stands for the proposition that an issue not raised in the district

court be raised for the first time in the circuit court. It is patent to this Court that neither of these rationales has any bearing on this case.

This being said, this Court finds the passing reference in plaintiff's brief to the fact that the ALJ did not consider Listing 12.02, pertaining to organic brain damage, but should have done so in light of "the evidence of brain surgery with resultant seizure disorder and chronic persistent headaches," to be without merit. Having reviewed Listing 12.02 this Court understands why the ALJ did not mention it in his decision. The fact that the plaintiff has undergone brain surgery and has experienced episodic seizures falls so far short of meeting the elements of that Listing there was no reason for the ALJ to consider it.

Turning to the deficiency this Court perceives regarding the evidentiary hearing, this Court cannot understand the failure of (primarily) plaintiff's counsel or the ALJ to ask the vocational expert what effect the plaintiff hearing voices telling him to kill people and what the plaintiff did in response thereto would have on the plaintiff's ability to engage in full time employment. As previously noted, neither counsel nor the ALJ asked Mr. Burkhammer whether the plaintiff would be employable if his testimony was credible.

Of greater concern to this Court is the primary question of whether the ALJ's decision is supported by substantial evidence. In this Court's opinion it is not, albeit not for the reason argued in plaintiff's submission.[3]

Before reaching the deficiency in the ALJ's decision this Court will address the issues raised

---

[3]This raises a consideration which has bedeviled this Court for the thirty plus years that this Court has reviewed disability appeals—should the Court restrict itself to the arguments advanced by plaintiff's counsel or take into account what the Court considers to be a glaring error by the ALJ that counsel has missed. As the resolution of these appeals may well determine the standard of living for the claimant for many years to come, this Court believes that "doing justice" demands that the Court not deprive claimant of the opportunity to receive a benefit award to which he/she may be entitled because his/her counsel "blew it."

8

by plaintiff's counsel, which this Court finds to be insufficient to warrant setting aside the defendant's final determination.

Plaintiff's first claim of error revolves around Listings 12.02 and 12.05. This Court has already considered the argument pertaining to Listing 12.02, and finds plaintiff's contention that the plaintiff should have been found disabled under Listing 12.05 also to be without merit. That Listing, containing four subparts, pertains to disability based upon "Mental Retardation and Autism." It is plain that the plaintiff does not suffer from autism, and it is equally plain that, as is conceded in plaintiff's brief, there is no evidence in this record that the plaintiff manifested "deficits in adaptive behavior initially manifested during the developmental period (before age 22)," as is required to support a finding of disability based upon mental retardation. The record also lacks IQ test results which could support a finding of mental retardation.

The shortcoming in the argument headed "Did the ALJ have substantial evidence to discount the opinion of the treating physician?" is that there is no opinion of a treating source in this record speaking to that physician's opinion as to the plaintiff's ability to engage in work related activities. What are in the record are diagnoses made by the plaintiff's treating mental health sources, including GAF ratings assigned by them. What is not in the record is a statement by any of those sources as to their opinion how the diagnosed disorders would impact upon the plaintiff's ability to obtain/keep a job.

The third argument—"Did the ALJ articulate a valid basis for finding the plaintiff on [sic] partially credible?" is so generalized that this Court reads it as a critique of the ALJ's credibility finding, rather than demonstrating that the ALJ had no valid basis for discounting the plaintiff's credibility.

9

There are, nevertheless, two aspects of the ALJ's decision which are of critical concern to this Court.

The first is the fact it is clear from the ALJ's decision that in large part it rests upon a report from a clinical psychologist, Dr. Frederick G. Leidal, which this Court believes cannot constitute substantial evidence to support the conclusion that the plaintiff is not disabled.

The second is the following statements in the ALJ's decision:

> The claimant's testimony about auditory hallucinations was vague. <u>He did not exhibit any external signs that he was hearing auditory hallucinations.</u> He admits to treating sources that he does not act upon the voices and disregards them.
>
> \* \* \*
>
> <u>Because the claimant does not exhibit any external signs of hearing auditory hallucinations</u>, and does not act upon them, I accommodate the claimant's complaints of auditory hallucinations by limiting him to simple routine tasks requiring only minimal supervision, no interaction with the general public, and only superficial interaction with co-workers and supervisors.

(Emphasis added.)

Taking up the second of these first, there is not a shred of evidence in this record from a mental health professional as to whether an individual suffering rom auditory hallucinations would exhibit any "external signs" that such was occurring, or if there are any such what they would be. Where the ALJ came up with the notion that a person who suffers from auditory hallucinations would manifest external signs of that mental disorder is a mystery to this Court.

In this Court's opinion, to discount the plaintiff's testimony that he hears voices telling him to injure others because he does not manifest external signs of those auditory hallucinations and/or has been able to suppress acting in response to those voices is completely untenable.

While this Court believes that this alone calls for reversal of the defendant's final determination and remand for further proceedings at which a competent mental health professional would be called to testify on the subject of auditory hallucinations, it is not, in this Court's opinion, the only error requiring that remand.

As previously noted, it is clear that in reaching his decision the ALJ placed substantial weight on a report from Dr. Frederick Leidal, including the fact that in setting out his "DSM-IV Tr Multiaxial Classification[s]" under Axis I Dr. Leidal set out "V 65.2 malingering" and "304.80 Polysubstance Dependence, Remission."

In this Court's opinion there are two shortcomings with regard to the Leidal report.

First, it was not generated in conjunction with the application that underlies this proceeding, which was filed November 29, 2005, being dated June 17, 2004.  Obviously, Dr. Leidal's evaluation was undertaken as a result of plaintiff's 2004 application, which ended at the state agency level. This may or may not account for the fact that there is no mention therein of auditory hallucinations, which the plaintiff testified began in 1996 but had intensified over the years since.

Second, there is absolutely nothing in the body of the report which would reflect that Dr. Leidal, either by reason of test results or observation of the plaintiff, had any reason to believe that the plaintiff was a malingerer.  In fact, in the Summary and Conclusions portion thereof Dr. Leidal stated "Results of this examination suggest that this patient has a general level of intelligence that appears to be in the borderline range of intellectual functioning.  Memory functions, in general, such [sic] recall of present and past events, or incidental memory, appeared to be consistent with levels of intelligence.  Psychoeducational skills were measured and were in the borderline to low average range of ability, which is generally consistent with his level of intellect."  Nevertheless, the ALJ

11

referred to the Axis I diagnosis of malingering several times in his decision.

There is also the factor that the ALJ stated he was giving credence "to the office treatment notes of Drs. Shah, Haidet, Kwan, Portage Path Behavioral Health Services and Coleman Professional Services since they were made in the course of medical treatment for the actual purpose of medical treatment, so they are inherently more reliable." Having said that, he then ignored the fact that the treatment notes from Kevin Coleman Center covering the period June 2007 to January 2008 reflect that the plaintiff was consistently assigned a GAF rating of 50 or below, fifty being the bottom of the "Serious symptoms" range, connoting "unable to keep a job," and the range below that represents "Some impairment in reality testing or communication." The Portage Path records from an earlier period also contain a GAF rating of 50. Nowhere in any of those "inherently reliable" treatment records is there an expression of the slightest doubt regarding the plaintiff's complaints of auditory hallucinations or that his treating sources considered the possibility that he was a malingerer.

In his decision the ALJ stated that "the claimant received rather sporadic medical care," reciting the number of visits the plaintiff had with treating sources in 2004 to 2008. There is, however, nothing to suggest that those visits at public health facilities were any less than the treating sources deemed appropriate, and there is not mention in the ALJ's listing of the plaintiff's several visits with Dr. Kontos at the Coleman facility.

Based upon all the foregoing, it is recommended that the defendant's final determination be reversed and an order of remand pursuant to the fourth sentence of §405(g) be entered, with a specific directive that at the further evidentiary hearing a mental health professional be called to testify.

                                                                                                    s/DAVID S. PERELMAN
                                                                                                    United States Magistrate Judge

DATE:    March 24, 2010

## OBJECTIONS

      Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).